## OLDDEN et al. v. TONTO REALTY CORPORATION.

### No. 282.

Circuit Court of Appeals, Second Circuit.

May 17, 1944.

FRANK, Circuit Judge, dissenting in part.

Julius M. Arnstein, of New York City (Dannenberg & Hazen, of New York City, on the brief), for appellant.

Sidney C. Norris, of New York City (Louis Timberg, of Brooklyn, N. Y., on the brief), for appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

When the bankrupt, B. Westermann Company, Inc., filed its bankruptcy petition on March 5, 1942, the Tonto Realty Corporation, although itself only a lessee from the owner of the fee, was landlord of certain space on premises 18-20 West 48th Street, New York City, under a lease with the bankrupt expiring January 31, 1948. By the time of the bankruptcy the rental had become, by adjustment, $22,769.95 per year and there was owing the sum of $4,904.38 in back rent. This latter sum, however, included rent for the month of March; and since the trustee in bankruptcy occupied the premises, along with a sub-tenant and at the agreed rental, until June 20, 1942, the net amount of arrears, after deducting the rent paid for the overlapping period in March, was $3,313.70. Thereafter Tonto rerented the premises at a rental substantially lower than that reserved in the lease with the bankrupt. The new tenant defaulted, however, after two months, and Tonto itself was dispossessed for nonpayment of rent to its landlord in January, 1943. It then filed a claim for back rent and for damages.

Under an "ipso facto clause" of the lease (Paragraph 21), Tonto and the bankrupt had agreed that upon the latter's bankruptcy the lease should "expire ipso facto cease and come to an end," in which event there should be due the landlord as liquidated damages a sum to be computed as therein provided representing the difference between the cash value of the future rent as reserved and the cash rental value for the balance of the term, not exceeding any limit set by a governing statute.[1] Applying the formula stated in this clause the bankruptcy referee found that the liquidated damages—before application of a statutory limitation—would be $40,307.81, from which should be deducted the sum of $3,000 held by Tonto as security under the lease,[2] leaving a total of $37,307.81. By amendment of the Bankruptcy Act in 1934, now § 63, sub. a(9), 11 U.S.C.A. § 103, sub. a(9), however, there were added to the allowable claims in bankruptcy claims for anticipatory breach of contract, including unexpired leases of realty, but with the limitation that a landlord's claim for damages upon the rejection of an unexpired lease or "for damages or indemnity under a covenant contained in such lease shall in no event be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after bankruptcy, plus an amount equal to the unpaid rent accrued, without acceleration, up to such date." Because of this statutory provision, the referee reduced the total claim as allowed to one year's rent, $22,769.95, plus back rent of $3,313.70, or $26,083.65. On the trustee's petition to review, the district court held that the $3,000 deposited as security should be deducted not from the provable claim of $43,621.51, but from the allowable claim of $26,083.65, and hence modified the referee's order to allow Tonto's claim in the sum of $23,083.65. D.C.S.D.N.Y., 51 F. Supp. 776. Both parties have appealed, the

[1] Paragraph 21 provided as follows: "If at any time during the term hereby demised, a petition shall be filed, * * * in bankruptcy * * *, then immediately upon the happening of any such event, and without any entry or other act by Landlord, this lease shall expire ipso facto cease and come to an end with the same force and effect as if the date of the happening of any such event were the date herein fixed for the expiration of the term of this lease. It is further stipulated and agreed that, in the event of the termination of the term of this lease by the happening of any such event, Landlord shall forthwith, upon such termination, and any other provisions of this lease to the contrary notwithstanding, become entitled to recover as and for liquidated damages caused by such breach of the provisions of this lease an amount equal to the difference between the then cash value of the rent reserved hereunder for the unexpired portion of the term hereby demised, and the then cash rental value of the demised premises for such unexpired portion of the term hereby demised, unless the statute which governs or shall govern the proceeding in which such damages are to be proved limits or shall limit the amount of such claim capable of being so proved, in which case Landlord shall be entitled to prove as and for liquidated damages an amount equal to that allowed by or under any such statute. The provisions of this paragraph of this lease shall be without prejudice to Landlord's right to prove in full damages for rent accrued prior to the termination of this lease, but not paid. This provision of this lease shall be without prejudice to any rights given to Landlord by any pertinent statute to prove for any amounts allowed thereby.

"In making any such computation, the then cash rental value of the demised premises shall be deemed prima facie to be the rental realized upon any reletting, if such reletting can be accomplished by Landlord within a reasonable time after such termination of this lease, and the then present cash value of the future rents hereunder reserved to the Landlord for the unexpired portion of the term hereby demised shall be deemed to be such sum, if invested at four per cent (4%) simple interest, as will produce the future rent over the period of time in question."

[2] The deposit was made by the tenant pursuant to Paragraph 42 of the lease, providing that it should be security for the full and faithful performance of all the terms and conditions of the lease, that it should bear interest at 2% per annum, and that, if the tenant had fully performed, $2,000 of it should be returned at the expiration of the originally demised term, notwithstanding sooner termination by reason of the tenant's default, and the balance applied on the last month's rent.

trustee contending that nothing is due except the arrears of rent, less the security, i.e., $313.70, and the creditor asserting that the deposit should be deducted from the total damages claimed, rather than from the allowable claim, and hence that the referee's, rather than the court's, computation should be followed.

■■■ The trustee's contention that no damages for breach of the lease should be allowed has as its premise the admitted fact that bankruptcy was a limitation, terminating the lease before the demised term, but requires also the further step that no provision should have been made for the payment of damages in the event of such termination. Since this is so obviously just what the parties were attempting to do in Paragraph 21, the trustee's construction of the language is tortured, to say the least, justifying the "scant consideration" of the referee and the total ignoring of the point by the court, of which the trustee so vigorously complains. Thus he asserts that there could be no damages "for the unexpired portion of the term hereby demised," since the term had expired by its terms; but the first line of the paragraph—quoted above in the footnote—shows that the "term" intended was the original term of ten years. Under the relevant state authorities, as well as the substantially identical case of In re Outfitters' Operating Realty Co., 2 Cir., 69 F.2d 90, affirmed Irving Trust Co. v. A. W. Perry, Inc., 293 U.S. 307, 55 S.Ct. 150, 79 L.Ed. 379, an express provision that bankruptcy is a breach, for which damages are provided, is concededly valid; but the attempted distinction here that the provision for damages fails because of lack of the word "breach" seems to us altogether too thin to justify thwarting so clear an intent, particularly when the paragraph does speak of "liquidated damages caused by such breach of the provisions of this

lease." We are clear that Tonto had a valid claim under § 63, sub. a(9), subject to the latter's specified limitations. See 3 Collier on Bankruptcy, 14th Ed. 1941, 1898.[3]

The landlord's appeal, however, presents an interesting and novel question. As far as we can determine, there are no decisions prior to the present case specifically deciding whether a landlord is required to deduct the amount of security held under a lease from the total damages provided by the lease or from the total claim allowable under § 63, sub. a(9) of the Bankruptcy Act. Some consideration of the background and history of the legislation is, therefore, necessary.

The Bankruptcy Act of 1898 as originally enacted was silent as to the provability of claims for rent to accrue in the future. The courts, however, were virtually unanimous in deciding that rent destined to accrue after the filing of a petition was not capable of proof, since there was no fixed liability absolutely owing, but merely a demand contingent upon uncertain events. In re Roth & Appel, 2 Cir., 181 F. 667, 31 L.R. A.,N.S., 270; Wells v. Twenty-First St. Realty Co., 6 Cir., 12 F.2d 237; Watson v. Merrill, 8 Cir., 136 F. 359, 69 L.R.A. 719; Manhattan Properties, Inc., v. Irving Trust Co., 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed. 824; In re Metropolitan Chain Stores, Inc., 2 Cir., 66 F.2d 482, appeal dismissed Malavazos et al. v. Irving Trust Co., 290 U.S. 709, 54 S.Ct. 207, 78 L.Ed. 609; In re Marshall's Garage, Inc., 2 Cir., 63 F.2d 759; In re F. & W. Grand 5-10-25 Cent Stores, 2 Cir., 74 F.2d 654, appeal dismissed Urban Properties Co. v. Irving Trust Co., 296 U. S. 658, 56 S.Ct. 81, 80 L.Ed. 469. This was not a matter of logic, but "of history that has not forgotten Lord Coke" (per Holmes, J., in Gardiner v. William S. Butler & Co., 245 U.S. 603, 605, 38 S.Ct. 214,

---

[3] Indeed, the only problem still presented by an ipso facto clause after the 1934 amendment would seem to be whether damages provided by such a clause are provable without limitation under § 63, sub. a(4), 11 U.S.C.A. § 103, sub. a(4)—claims founded upon express or implied contract—or whether the limitation of subd. (9) is applicable. Here the landlord, although calling attention to the problem, has not claimed the full damages without limitation; and it seems the better view that Congress surely intended to include such clauses, as well as other provisions of a like nature,

within the purview of subd. (9) and subject to the one year's rent limitation. See Hippodrome Bldg. Co. v. Irving Trust Co., 2 Cir., 91 F.2d 753, 756, certiorari denied 302 U.S. 748, 58 S.Ct. 265, 82 L.Ed. 578; 3 Collier on Bankruptcy, 14th Ed. 1941, 1881–1907; Newman, Rent Claims in Bankruptcy and Corporate Reorganization, 43 Col.L.Rev. 317, 320; 44 Yale L.J. 670; but see Roeder, Landlords, Bankruptcy, and 77B, 23 Corn.L.Q. 285, 299; cf. Finletter, The Law of Bankruptcy Reorganization, 1939, 291–292; and 2 Gerdes on Corporate Reorganizations, 1936, 1134, 1135.

62 L.Ed. 505), for rationally it was most difficult to reconcile this doctrine with the generally liberal treatment in bankruptcy cases of other types of anticipatory breaches of contracts.[4] Hence the result was often harsh as to the landlord, though it did prevent the exhaustion of bankrupt estates for disproportionately large lease claims.

Beyond the fact that landlords' claims for future rent were not provable in any event, the earlier cases also held that the bankruptcy of the tenant constituted an absolute termination of the lease, so that no further claim of any kind remained to the landlord. In re Jefferson, D.C.Ky., 93 F. 948; In re Hays, Foster & Ward Co., D.C.W.D.Ky., 117 F. 879. This rule was soon supplanted, however, by the majority view that bankruptcy had no effect at all on such claims; they were not provable, and the debtor did not receive a discharge therefrom. The landlord thus retained a valid claim for damages as long as he did not terminate the obligations of the lease by re-entering; but unless there was a specific stipulation for damages contained in the lease, a re-entry did release the tenant from liability for future rents. South Side Trust Co. v. Watson, 3 Cir., 200 F. 50; In re Gallacher Coal Co., D.C.N.D. Ala., 205 F. 183; In re H. M. Lasker Co., 3 Cir., 251 F. 53, certiorari denied Meyran v. Watt, Trustee, 248 U.S. 562, 39 S.Ct. 8, 63 L.Ed. 422.[5] A natural consequence was that landlords sought to discover some means of protecting themselves against the event of the tenant's bankruptcy. A first expedient was the reservation in the lease of a right of re-entry in the landlord and the inclusion of a covenant of indemnity by the lessee for all loss of future rent occasioned by bankruptcy. But the courts branded this also a contingent claim incapable of proof, since at the time of the filing of the bankruptcy petition there still remained uncertainty as to whether or not the option would be exercised by the landlord. Manhattan Properties, Inc., v. Irving Trust Co., supra; In re Roth & Appel, supra; Slocum v. Soliday, 1 Cir., 183 F. 410. Resort was then had to the so-called ipso facto clause, in which the lease automatically terminates upon the filing of the petition, as exemplified by Paragraph 21 of the instant lease. This covenant eventually received judicial approval, as we have seen, in Irving Trust Co. v. A. W. Perry, Inc., supra, which was not decided until after the passage of the 1934 amendment.[6]

Although this result could be easily justified on technical legal grounds, its consequence presented distinctly unattractive elements from the standpoint of policy.[7] It made landlords' claims depend on the niceties of ancient property law, rather than on the practical aspects of modern business. Then landlords, especially in the depression years from 1929 on, when there was a tremendous depreciation of rental values, were particularly hard hit by the bank-

---

[4] The Supreme Court in Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 36 S.Ct. 412, 60 L. Ed. 811, held that bankruptcy constitutes anticipatory breach of contract, and that damages from such breach should be provable whenever there is no really insurmountable obstacle to their liquidation. See Brown v. O'Keefe, 300 U.S. 598, 57 S.Ct. 543, 81 L.Ed. 827; Maynard v. Elliott, 283 U.S. 273, 51 S. Ct. 390, 75 L.Ed. 1028; Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953; In re Paramount Publix Corp., 2 Cir., 72 F.2d 219; In re F. & W. Grand 5-10-25 Cent Stores, 2 Cir., 74 F.2d 654, appeal dismissed Urban Properties Co. v. Irving Trust Co., 296 U.S. 658, 56 S.Ct. 81, 80 L.Ed. 469; In re Beverlyridge Co., 9 Cir., 35 F.2d 818; 3 Collier on Bankruptcy, op. cit. 1878–1886. This rule has been applied in a great variety of situations other than that of leases. See the collection of cases in In re Owl Drug Co., D.C.Nev., 12 F.Supp. 439, 441, 442.

[5] The re-entry had to be, however, for the specific purpose of termination. McDonnell v. Woods, 1 Cir., 298 F. 434.

[6] The Court there held that "The claim is not for rent reserved or upon the lease as such, but is founded upon an independent express contract, and hence within the very words of section 63(a) (4)." 293 U.S. at page 311, 55 S.Ct. at page 151, 79 L.Ed. 379. See also note 3, supra.

[7] The legal periodicals have not been blind to the problem. Among valuable discussions are Douglas and Frank, Landlords' Claims in Reorganizations, 42 Yale L.J. 1003; Fallon, Lessors as Creditors in Bankruptcy, 4 Brooklyn L.Rev. 11; Newman, supra note 3; Radin, Claims for Unaccrued Rent in Bankruptcy, 21 Calif.L.Rev. 561, 22 Calif.L.Rev. 1; Roeder, supra, note 3; Schwabacher and Weinstein, Rent Claims in Bankruptcy, 33 Col.L.Rev. 213; Notes, 47 Harv.L.Rev. 488; 32 Mich.L.Rev. 664; 44 Yale L.J. 670.

ruptcies of corporate tenants; for even though their claims for damages survived bankruptcy, the corporate entities in most cases did not and the landlords were left holding valid claims against permanently defunct corporations.[8] Moreover, the main object of the Bankruptcy Act to afford means of rehabilitation of an honest bankrupt through discharge of his debts was thwarted by the nondischargeable character of these large rent claims. See Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 591, 36 S.Ct. 412, 60 L.Ed. 811. But allowance in full of such claims did not seem the appropriate answer, since other general creditors would suffer proportionately, and the claims themselves would often be disproportionate in amount to any actual damage suffered, particularly in the event of a subsequent rise in rental values. In truth, the landlord is not in the same position as other general creditors, and there is no very compelling reason why he should be treated on a par with them. For, after all, he has been compensated up until the date of the bankruptcy petition, he regains his original assets upon bankruptcy,[9] and the unexpired term in no way really benefits the assets of the bankrupt's estate. See Trust Co. of Georgia v. Whitehall Holding Co., 5 Cir., 53 F.2d 635; In re Metropolitan Chain Stores, Inc., supra.

■ This, then, was the state of affairs when in 1934 Congress adopted the amendment to § 63, sub. a, making claims for future rent specifically provable.[10] The amendment was an obvious compromise between the various conflicting interests outlined above, and was reached only after serious research and study on the part of the legislators. City Bank Farmers' Trust Co. v. Irving Trust Co., 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324; Kuehner v. Irving Trust Co., 299 U.S. 445, 453, 57 S.Ct. 298, 81 L.Ed. 340. As Professor Moore states, "The statutory solution represented a happy medium and imposed on the creditors a limited sacrifice in order to achieve the desirable end of facilitating the debtor's rehabilitation by extending the scope of his discharge." 3 Collier on Bankruptcy, 14th Ed. 1941, 1894. In the light of this history and purpose of the statutory provision and its clearly expressed intent,[11] we should construe it so as to give it full force and effect, and not allow it to be nullified by crafty draftsmanship in particular leases. See 3 Collier on Bankruptcy, op. cit. 1900. Nor should a landlord obtain an advantage beyond that usually accorded under the statute merely because he has been shrewd or economically powerful enough to have obtained a substantial deposit as security. The contrary result would mean that a landlord with security would be able to exceed the statutory limit by as much as the security he holds, and that landlords would receive different treatment in bankruptcy proceedings, depending upon the existence and size of the security in their possession. Thus the two primary objectives of § 63, sub. a(9), would be flaunted. Compare Newman, Rent Claims in Bankruptcy and Corporate Reorganization, 43 Col.L.Rev. 317, 322-324.

---

[8] This problem is said to have been particularly acute in the case of landlords of chain stores, who, holding leases at high rentals made in boom days and faced with lowered prices and sales throughout the country, resorted to bankruptcy as a means of breaking such leases. See Douglas and Frank, supra note 7; Smith, Chain Stores and the Lease Plague, 58 Financial World 367; Comment, 32 Mich.L.Rev. 664, 670.

[9] For discussion of the importance of this criterion, see Kuehner v. Irving Trust Co., 299 U.S. 445, 455, 57 S.Ct. 298, 81 L.Ed. 340, pointing out the difference between the status of a landlord-creditor and the usual general creditor in explanation of the action of Congress in placing the two on different bases in corporate reorganizations under § 77B, sub. b(10), 11 U.S.C.A. § 207, sub. b(10).

[10] By adding a new subdivision (7) to § 63, sub. a, 48 Stat. 923, c. 424, § 4(a), which is now found in subd. (9) of § 63, sub. a, 11 U.S.C.A. § 103, sub. a(9). Sec. 77B, applying to corporate reorganizations, was also amended at the same time by the addition of subd. b(10), 48 Stat. 912. This amendment was substantially similar to § 63, sub. a(9), except that the limitation was extended to three years' rent. For discussion of its constitutionality and function, see City Bank Farmers Trust Co. v. Irving Trust Co., 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324, and Kuehner v. Irving Trust Co., supra.

[11] "The legislative history of this provision, and the successive alterations of its wording in both Houses of Congress and in conference, to which we are referred, cannot affect its interpretation, since the language of the act as adopted is clear." Kuehner v. Irving Trust Co., supra, 299 U.S. at page 449, 57 S.Ct. at page 300, 81 L.Ed. 340.

And all this would be deduced from a statute purporting to define provable claims, but saying nothing about security, of which, of course, the landlord gets full benefit through its application to his claim, thus affording him, so far forth, full payment in place of the usual small dividend.

Persuasive to this result is also the analogy of the decisions dealing with guaranty or surety contracts for rent. In Hippodrome Bldg. Co. v. Irving Trust Co., 2 Cir., 91 F.2d 753, 756, certiorari denied 302 U.S. 748, 58 S.Ct. 265, 82 L.Ed. 578, we held that a lessor's claim in a reorganization proceeding against a corporation which had guaranteed payment of the rent reserved in the lease and performance of the lessee's covenants, the lease having been rejected by the lessee's trustee in bankruptcy and the premises having been relet at a loss, was subject to the three-year provision of § 77B(b) (10), 11 U.S.C.A. § 207(b) (10). We said that if this were not so "a guarantor in reorganization is liable for more than his principal; that cannot be the meaning of the statute; the guaranty is a secondary obligation and must be subject to the same limitations as the primary." Then, in In re Schulte Retail Stores Corp., 2 Cir., 105 F.2d 986, we extended this doctrine to the case of a surety under similar circumstances, even though a surety is a primary obligor himself. Although the instant case is admittedly different in that the tenant here pledged his own property to cover the possibility of default, and the rights of a third party are in no way involved, yet in both situations there is an attempt on the part of the landlord to insure performance by the tenant. The difference is purely technical, viz., that in one case the insurance is security put up by the tenant himself, while in the other it is the credit standing of a third party procured by the tenant; this difference is insufficient to justify divergent rules as to the respective allowable claims. If the total damages are limited in the one instance, they should likewise be limited in the other instance.

It may be suggested that this renders anomalous the situation where the landlord, by virtue of obtaining an unusually large deposit in advance, has still a balance in his hands after deducting the claim for one year's rent allowed by the statute. Any question here may be academic, for apparently the security ordinarily obtained by landlords seems to vary from one to six months' advance rent only; we have discovered no reported case where it even approaches the statutory limit of one year's rent. But it does not seem to us that the situation should be considered anomalous. If we are correct that the statute sets a limit on damages for breach of a lease by bankruptcy, then the landlord should be entitled only to that sum and not more; otherwise the security would be in the nature of a forfeiture in the event of bankruptcy, and forfeitures are not favored by the courts. Seattle Rialto Theatre Co. v. Heritage, 9 Cir., 4 F.2d 668. It is clear that when the lease is at an end, and no damages can thereafter be due, the security must be returned. Cannon v. Fifty-Sixth St. Garage, Inc., 2 Cir., 45 F.2d 110. Hence, even before the 1934 amendment, the security could be retained only as against possible claims, and the cases assumed that upon complete termination of the lease upon bankruptcy, any surplus over damages allowable in bankruptcy was returnable to the trustee.[12] The statute now makes the termination of the lease complete, and the damages fixed; and anything in excess should go to the trustee for the general creditors.

Judgment affirmed.

[12] Thus, in In re Homann, 2 Cir., 45 F.2d 481, the only controversy concerned whether or not a certain clause of the lease, continuing until the end of the original term the obligations of the lease, survived bankruptcy. The court, following the law of the situs, New York, held that it did; hence the deposit was not returnable until the end of the original term. This decision was followed in Model Dairy Co. v. Foltis-Fischer, Inc., 2 Cir., 67 F.2d 704, and in In re Luria, D.C.E.D.N.Y., 46 F.Supp. 305. On a similar fact situation, Floro Realty & Investment Co. v. Steem Electric Corp., 8 Cir., 128 F.2d 338, construed Missouri law as holding that the clause did not survive and returned the security. In Seattle Rialto Theatre Co. v. Heritage, 9 Cir., 4 F.2d 668, the court deemed certain securities held by the landlord a deposit and ordered their return, since the lease had terminated and there were no more damages owing to the landlord. In Re Barnett, 2 Cir., 12 F.2d 73, certiorari denied United Cigar Stores Co. v. Rayher, Trustee, 273 U.S. 699, 47 S. Ct. 94, 71 L.Ed. 846, the propriety of the

FRANK, Circuit Judge (dissenting as to the decision on the respondent's appeal).

Partly because of a devotion to Coke's antiquarian delight in feudal precedents, perhaps obsolescent even in his day,[1] it had been held, as my colleagues say, before the 1934 amendment to the Bankruptcy Act, that a landlord could be allowed nothing in his lessee's bankruptcy proceedings for damages resulting from an anticipatory breach of a lease occasioned by the bankruptcy. Such a ruling was often hard on the landlord. But it was also hard on the discharged bankrupt for, if he later acquired assets, they were likely to be subjected to the undischarged claim of the landlord.[2] The 1934 amendment aimed to avoid these hardships.

But I cannot agree with my colleagues that Congress, in that amendment—designed to un-feudalize the law of leases and to do some justice to landlords without injuring the other creditors of lessees—was activated by any Henry Georgian animosity to owners of land. It is difficult for me to believe that Congress has become so collectivist-minded, so opposed to the common characteristics of our profit system, that it intended that a landlord should not (to quote my colleagues) "obtain an advantage merely because he has been shrewd or economically powerful enough to have obtained a substantial deposit as security" and that landlords should not "receive different treatment * * * depending upon the existence and size of the securities in their possession." Perhaps it is desirable that by legislation such a levelling should be brought about, that by statute landlords should thus be deprived of the benefits of good bargains they have made. But that is not a problem for the courts; if it were, we might consider that, generally, owners of land in our day do not benefit from any "unearned increment" but suffer from an "unearned decrement."[3]

I see no reason to think that Congress intended that a landlord who, bargaining with a tenant of whose financial stability he is doubtful, and to whom he would not otherwise lease his property, demands and receives security, is, with respect to that security, to be treated differently from other secured creditors. An ordinary secured creditor, under § 57, sub. h, 11 U.S.C.A. § 93, sub. h, can retain his security only to the point where it makes him whole; he is allowed to share in the estate only so far as he is unsecured; the value of the security is deducted from his total claim, and, if there is a deficiency, he is, to that extent, an unsecured creditor and permitted to participate. That is to say, a secured creditor, as such, has no provable claim; he may share in the estate only so far as he is an unsecured creditor; as such, he is treated like every other unsecured creditor.

Nothing in the wording or legislative history of the 1934 amendment to § 63, sub. a, shows any purpose to modify § 57, sub. h, any plan to accord a peculiar status to a secured landlord. There is not a syllable on the subject of security in the amendment, nothing to suggest that Congress had that subject in mind. Under § 57, sub. h, if a landlord is wholly secured, he, like any other secured creditor, has no provable claim. He has one only if he is partially unsecured. With respect to his unsecured balance, he is, I think, in precisely the same position as a landlord without any security. The one-year-rent maximum, I think, applies to his unsecured balance just as it does to the claim of a wholly unsecured landlord. Why the fixing of such a maximum should be regarded as amending § 57, sub. h I cannot understand.

I fail to see how our decisions in Hippodrome Bldg. Co. v. Irving Trust Co., 2 Cir., 91 F.2d 753, certiorari denied 302 U.S. 748, 58 S.Ct. 265, 82 L.Ed. 578, and In re Schulte Retail Stores Corp., 105 F.2d 986, supply us with any pertinent analogies. In

return of the securities was again assumed, and the main question was whether or not a summary suit by the trustee was proper.

[1] See Holdsworth, History of English Law, Vol. 5, 468, 474, 479, 489-491; cf. Vol. II (3d Ed. 1923) 574, 575, 588, 589; United States v. Forness, 2 Cir., 125 F. 2d 928, 938, 939.

[2] Moreover, attention had been called to the fact that this ruling, coupled with the doctrine of Northern Pac. R. Co. v.

Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L. Ed. 931, might frustrate the hopes of debtors seeking by reorganization in bankruptcy to avoid their obligations under leases. See 42 Yale L.J. 1003. The amendment in 1934 of § 77B probably was inspired in part by a desire to relieve reorganizers of the nightmare of the Boyd case.

[3] See Abrams, Revolution in Land (1939).

those cases we held that where a guarantor or surety of the lease of a bankrupt lessee is itself in process of reorganization under § 77B, the landlord's claim must be limited in the same way as if the claim were against the estate of the bankrupt estate of the lessee.[4]

Because I think that, for the reasons above noted, my colleagues have reached an erroneous conclusion, I shall not discuss the problem suggested in note 3 of the majority opinion. Nor shall I discuss in detail the question whether, in the light of the Court's reasoning in Kuehner v. Irving Trust Co., 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340, concerning the constitutionality of the 3-year provision in § 77B(b) (10), the one-year provision is constitutional; I merely note that such a severe limitation—and one in which Congress, while saying that, in corporate reorganizations in bankruptcy, a maximum of three years' rent is reasonable, fixed this very substantially smaller maximum with no explanation of a rational basis for the distinction—brings this provision of the statute close to the edge of invalidity and that, therefore, it should not be interpreted to create such further hardships as may bring it still closer.[5] The decision here is the more serious because of our previous decision that the 1934 amendment is retroactive.[6] It will be peculiarly harsh in its application to leases made before 1934 where, although the security is less than the actual damages, the security exceeds in value the amount of the next year's rent, for under the decision here the trustee in bankruptcy will be entitled to recover that excess.

---

[4] I have found no cases in which, since the 1934 amendment, a suit was brought against the solvent surety or guarantor of a lease of a bankrupt tenant. The position of the landlord in such a case would perhaps be analogous to his position in cases like that at bar with reference to the security.

[5] United States v. Delaware & Hudson Co., 213 U.S. 366, 407, 408, 29 S.Ct. 527, 53 L.Ed. 836; United States v. Standard Brewery, 251 U.S. 210, 220, 40 S.Ct. 139, 64 S.Ct. 229; State of Texas v. Eastern Texas R. Co., 258 U.S. 204, 217, 42 S.Ct. 281, 66 L.Ed. 566; Bratton v. Chandler, 260 U.S. 110, 114, 43 S.Ct. 43, 67 L.Ed. 157; United States v. Jin Fuey Moy, 241 U.S. 394, 401, 402, 36 S.Ct. 658, 60 L.Ed. 1061; Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 75 L. Ed. 206; Harriman v. Interstate Commerce Comm., 211 U.S. 407, 422, 29 S. Ct. 115, 53 L.Ed. 253; Knights Templars' & Masons' Life Indemnity Co. v. Jarman, 187 U.S. 197, 205, 23 S.Ct. 108, 47 L.Ed. 139; Panama R. Co. v. Johnson, 264 U.S. 375, 390, 44 S.Ct. 391, 68 L. Ed. 748; Baender v. Barnett, 255 U.S. 224, 226, 41 S.Ct. 271, 65 L.Ed. 597; Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851, 61 A.L.R. 906; Reinecke v. Northern Trust Co., 278 U.S. 339, 348, 349, 49 S.Ct. 123, 73 L.Ed. 410, 66 A.L.R. 397.

[6] In re Winn Shoe Co., 2 Cir., 87 F.2d 713.